WeldoN, J.,
delivered the opinion of the court:
On an amended petition, filed February 9, 1899, the claimants, James A. Mundy and Joseph Busch, prosecute this suit as surviving partners of William B. Johns, on a contract dated on the 23d day of April, 1891, made between the claimants, their deceased partner, and the defendants, for certain improvements of the harbor between Philadelphia, Pa., and Camden, N. J., as described in certain specifications attached thereto. The contract and specifications are annexed to and made a part of the petition as Exhibit A.
The general project of the work contemplated in the improvement is shown by the following extracts from the specifications:
“The work under these specifications contemplates the formation of a channel about 2,000 feet in width, with a cross section not far from 55,000 square feet at mean tide, along the Philadelphia shore from Kaighns Point to Fishers Point at a distance far enough from the present wharf line to permit the extension of the wharves and the widening of Delaware avenue at their shore ends.
“For this purpose it is proposed to remove Windmill and Smiths islands and the adjacent shoals, so as to form a 26-foot channel, about 1,000 feet wide, or wider if found practicable during the progress of the work, along the front of the revised Philadelphia wharf line from Kaighns Point to the foot of Pettys Island. It is further proposed to widen the Pennsylvania channel at Pettys Island, so as to give the Pennsylvania channel in this locality a width of about 2,000 feet, a depth of 26 feet over a width of about 1,000 feet, more or less, the channel sloping to a depth of 12 feet in the remaining width, and a resulting cross section of about 55,000 square feet.
“The material removed is in part to be deposited and spread on League Island and the balance is to be placed where it will not be an injury to the river.”
The contract, among other matters, provides that the claimants shall receive for said work, in accordance with the conditions of the agreement, the following prices, to wit:
“ (1) Ten and seven-eighths (10&) cents per cubic yard, measured in scows, for all material excavated, removed, and de *284 posited at places provided by the said James A. Mundy & Company and approved by the engineer officer in charge, for the entire improvement of Philadelphia Harbor as per plan approved by Congress.
“ (2) One dollar and ninety cents ($1.90) per linear foot for all pile and timber wharfing or revetment removed.
“ (8) Nine and one-half (9i) cents per cubic yard, measured in scows, for all dredged material deposited and spread upon League Island, this price to be in addition to the price per cubic yard paid under item (1).”
The amended petition is the pleading on which plaintiffs rely as a statement of their claim in the following sums, to wit:
Due for materials deposited at sea. $4,411.44
And for materials deposited on League Island. 17, 782.07
Retained percentages.-. 14,584.52
Withheld on revetment work. 1,031. 70
Withheld as inspection expenses. 5,191.16
43,000. 89
The contract is substantially a contract for dredging, and the principal contentions are as to how the work is to be measured, the extent of the agreement as to the amount of labor to be performed, and the right of the defendants to annul the contract.
The plaintiffs, by the allegations of the petition and by their contention upon the facts, claim that they diligently and faithfully performed the agreement, and that there is now due them the said sum; while the defendants insist that the plaintiffs did not faithfully perform their contract within the extensions of the same, that they failed and neglected to commence the work on time; failed and neglected to put on the work the necessaiy plant and machinery; that extensions were made from time to time in order to accommodate the plaintiffs and to insure the completion of the work; and that in consequence of such neglect and failure on the part of plaintiffs the defendants were compelled to annul the contract on the 23d day of December, 1892, and that by reason of such failure and annulment a large part of the work which the contract called for was left unperformed by plaintiffs; that in consequence of such failure the defendants were compelled to contract with other parties at a higher rate; that the contract required the plaintiffs to excavate and remove 18,000,000 cubic yards, and *285 they only excavated and deposited 775,161, leaving a difference of 17,724,839, which the defendants had to remove by and through other contractors at a higher rate of compensation, and that in consequence thereof the defendants were damaged in the sum of $572,725.90, being the difference between the contract price of plaintiffs and the price paid the new contractors.
One of the important contentions'in this proceeding is as to the scope of the agreement in the amount of work to be done. Is it a contract for the entire work contemplated by the general plan, or is it limited in its extent to what was substantially performed by the claimants?
In the view which the court has taken of the legal questions involved in this proceeding, it is not necessary to determine whether the obligation of the claimants as to the amount of work to be done is to the extent of the 18,000,000 cubic yards as provided in the general plan, or limited by the provisions of the specifications under the head of “commencement of the work,” in which the approximate amount of excavation in Windmill Island is stated, and which by the contention of the claimants limits the extent of the work to be performed.
If the claimants substantially failed to perform the amount . of labor of Windmill within the extended time, it is immaterial whether the contract contemplated the 18,000,000 cubic yards or only the approximate amount contained in Windmill Island. Having determined that the issues of the cause are not affected by the questions of the extent of the work contemplated by the agreement, we proceed to consider the rights of the parties on the other points of dispute.
As will be seen by the findings of fact, there was an extension of time from December 26, 1891, to June 30, 1892, and from June 30, 1892, to July 31, 1892, and then from July 31, 1892, to January 1, 1893. The engineer in charge of the wprk being dissatisfied with its progress, on the 23d day of December, 1892, by the authority of the Chief of Engineers, notified the claimants that the contract was annulled, and thereafter all work ceased.' A contention has arisen as to the right and propriety of the anulment of the contract under the circumstances.
Whatever may be said of the alleged default of the claim *286 ants in December, 1892, it is shown bj^ the findings that for some reason or other not appearing they were not able to perform the specified work within the limits of the original contract, nor within the three extensions, and about the 1st of December, 1892, the claimants having made application for a further extension, the proper authorities of the Department not only refused to extend the time, but, upon the contrary, annulled the contract, and thereby prevented the claimants from doing any further work.
By one of the provisions of the agreement it is specified that “if in any event the party of the second part shall delay or fail to commence with the delivery of the material or the performance of the work on the day specified herein, or shall, in the judgment of the engineer in charge, fail to prosecute faithfully and diligently the work in accordance with the specifications and requirements of this contract, then, in either case,, the party of the first part, or his successor legally appointed, shall have power, with the sanction of the Chief of Engineers, to annul this contract by giving notice in writing to that effect to the party or parties, or either of them, of the second part; and, upon the giving of such notice, all money or reserved percentage due or to become due to the party or pai’ties of the second part by reason of this contract shall be and become forfeited to the United States; and the party of the first part shall be thereupon authorized, if an immediate performance of the work or delivery of the materials be in his opinion required by the public exigency, to proceed to provide for the same by open purchase or contract, as prescribed in section 3709 of the Revised Statutes of the United States.”
Under a further clause of the agreement it is within the discretion of the engineer in charge to permit further time for the completion of the work, provided the failure to perform shall arise from causes over which the party of the second part has no control.
It is shown by the findings, that in the exercise of the power and authority of annulment the officer in charge of the work and the Chief of Engineers, acting in good faith and for causes which to them were reasonable and satisfactory at the time, annulled the contract. It has been held in numerous *287 cases that bad faith or the exercise of capricious and wanton power upon the part of the engineer in the annulment of a contract vitiates such annulment, and the party is not deprived of the rights which have accrued to him in the performance of the agreement and the right to a compensation for whatever he may have done in the execution of the contract. It is indicated by the fact of three extensions that for reasons which do not satisfactorily appear the claimants were not sufficiently diligent in the'prosecution of the work to perform it within the time of the original contract, nor within the time of the several extensions; so that when the annulment was made it indicates that it was an exercise of power founded upon the just conditions of the work with reference to its performance and execution.
It is insisted on the part of the defendants, that the claimants not having performed the agreement as required by its terms, the}’" are subject to the infliction of the consequence of that portion of the agreement which forfeits to the United States “all sums due and percentage retained.” It is clearly evidenced from the terms employed in the contract that the claim of the defendants to the percentage is incident to and dependent upon a penalty; and that the parties have not bjr the terms of their agreement made such percentage the representative of liquidated damages, but the same is contemplated by the terms of the agreement as a penalty. This being true, the defendants are remitted to such claim for damages as necessarily grow out of the failure upon the part of the claimants to substantially perform the agreement.
This court has in many cases passed upon the question as to whether a clause in a contract is to be taken as a mere penalty or as liquidated damages; and the court has held that it will be regarded as a penalty unless the contrary expressly and clearly appears.
In the case of Kennedy (24 C. Cls. R., 122) it is said:
“ Courts are loath to enforce penalties or forfeitures, and will not do so except in clear and’ imperative cases. Forfeitures and estoppels are not favored defenses, and are always subordinated to the equity of the right if possible.”
It was held in the case of Quinn v. United States (99 U. S. R., 30) that the retain of percentage, in a case very *288 much like the one at bar, was simply an indemnity for whatever damages the United States might suffer from a failure to perform the contract on the part of the claimants. It is said in that case, “ under such circumstances the United States no longer has a right to the money withheld for indemnity and security.”
In consequence of the annulment of the contract the defendants, on December 30, 1892, advertised to be let before January 31, 1893, a large amount of labor for dredging and removal of wharfing in Philadelphia Harbor and the depositing and spreading of material on League Island. As a result of that advertisement the American Dredging Company, on the 1st day of June, 1893, entered into an agreement with the defendants, the material portions of which are set forth in the findings.
The law is well settled that if the defendants were compelled to relet the same work at a higher price, and the claimants had failed to perform their agreement, the defendants are entitled to claim the difference between the prices which they were compelled to pay and the contract prices with the claimants. In order to determine the contentions of the parties upon this point, it is necessary to compare the work specified in the contract of- the claimants and the contract of the defendants. If there is a substantial difference, then the contract of the American Dredging Company does not afford a proper basis upon which any estimate of damages can be predicated.
Without discussing in detail tne different portions of the agreement made by the claimants and the American Dredging Company, it is sufficient to state that, in the opinion of the court there is such a difference as to constitute them in substance distinct in fact and in law, and therefore the contract of the American Dredging Company does not afford the defendants a correct basis upon which to predicate a claim for damages.
It is contended upon the part of the defendants that the claimants are legally chargeable with an item of $5,191.16 which accrued as cost of inspection incurred by the United States during the extension of time for the completion of the work embraced in the agreement. The time of an inspector *289 is charged to the claimants during the period of the extension of the contract. In order to determine the validity of this claim upon the part of the defendants, it is necessary to refer to the terms of the agreement upon that subject. It is provided that “if the party or parties of the second part shall by freshets, ice, or other force or violence of the elements, and by no fault of his or their own, be prevented either from commencing or completing the work, or delivering the materials at the time agreed upon in this contract, such additional time may, in writing, be allowed him or them for such commencement or completion as in the judgment of the party of the first part or his successor, shall be just and reasonable; but such allowance and extension shall in no manner affect the rights or obligations of the parties under this contract, but the same shall subsist, take effect, and be enforceable precisely as if the new date for such commencement or completion had • been the date originally herein agreed upon.”
It is insisted by the claimants, that by that provision of the contract they are relieved from the payment of the charge for the increased price of inspection because of the different extensions. In reply to that contention our attention is called to an antecedent provision of the agreement having special 'reference to the subject of extension, which is as follows: “If the time allowed for such work is.extended at the request of the contractor for any cause whatever, all resulting expenses to the United States , incurred after the date thus assigned shall be deducted from payments due or to become due the contractor.” The clause of the agreement relied on by the claimants is general, intending only to preserve the terms of the agreement in case of an extension, w^hile the latter clause is specific on the question of the effect of extensions, and must govern and determine the rights and obligations of the parties.
The controversy has arisen between the parties as to the amount of labor performed in the removal of Windmill Island and the amount of piling, timber, wharfing, and revetment removed. It is insisted by the claimants that they did not receive by the estimate of the engineer in charge their proper credits for the amount of work performed by them. In the contract it is provided, “all materials furnished and work *290 done under this contract shall, before being accepted, be subject to a rigid inspection by an inspector appointed on the part of the Government, and such as shall not conform to the specifications set forth in this contract shall be rejected. The decision of the engineer officer in charge as to quality and quantity shall be final.”
In pursuance of the power conferred upon the engineer in ■charge, he has allowed 161,809 cubic yards, scow measurement, for excavation and deposit of materials at places provided by the claimants; he has allowed 614,964 cubic yards, scow measurement, for material excavated and removed by claimants and deposited on League Island; he has also credited them in his final statement with 7,825 linear feet of piling, timber, wharfing, and revetment removed. The contention between the parties is as to the manner adopted by the engineer in charge in the measurement of the material. It is insisted by claimants that the measurement should be made as soon as the material is deposited in the scow. The theory of the engineer in charge is, and upon that basis he has allowed claimants, that the measurement is to be made, not at the time of the deposit of the material in the scows, but at the time the material reaches the place of deposit.
During the performance of the work this controversy arose between the parties as to the proper time of measurement, and the engineer in charge adopted the plan of making an average between the amount of scow measurement at the time it was loaded into the scow and at the time it reached its destination for deposit. The difference between measurement immediately upon the deposit of the material in the scow and the measurement adopted by a general average can not be determined. The court has therefore adopted the report made by the engineer in charge as the proper basis for an allowance. It is not shown that the engineer in charge acted in bad faith nor in violation of his duty as to the rights of the parties in the measurement by a general average; and the findings show the work performed by the claimants and the credits to which the defendants are entitled for the different payments made to the claimants during the progress of the work.
Computing the amount of work performed by the claimants at the prices specified in the agreement it amounts to the sum *291 of §157,587.83, for which the claimants have been paid the sum of $126,587.27; that the amount of expense incurred by the defendants in consequence of the increased cost of inspection amounts to the sum of $5,191.16, making in the aggregate the sum of $131,778.43, which being deducted from the amount due claimants for work performed leaves a balance of $25,809.40, and for that amount a judgment will be entered for the claimants.